STATE ex rel. RAILROAD AND WAREHOUSE COMMISSIONERS v.
MINNEAPOLIS & ST. LOUIS RAILROAD COMPANY.

June 9, 1899.

Nos. 11,581—(23).

## Laws 1897, c. 94—Railway Stations at Villages.

Laws 1897, c. 94, provides that all railroad companies shall provide, "at all villages and boroughs" on their respective roads, depots, with suitable waiting rooms for the protection and accommodation of passengers, and freight rooms for the storage and protection of freight. *Held*, that the word "village" must be construed as referring only to incorporated villages.

## Station at Unincorporated Village—State Boundary.

The facts considered, and *held* not to justify an order of the railroad and warehouse commissioners requiring the defendant to build and maintain a passenger station at an unincorporated village of one hundred inhabitants, situated in a strictly rural and agricultural part of the state, and within seven-tenths of a mile of an existing passenger. and freight station. The fact that the existing station is situated across the state line in another state is, in and of itself, no reason for requiring the defendant to build and maintain another station.

Alternative writ of mandamus issued by the district court for Freeborn county commanding respondent to build and maintain a station-house at Emmons, as required by an order of the railroad and warehouse commission, or to show cause why respondent should not comply therewith. The case was heard before Quinn, J., who made findings of fact, and as conclusion of law found that relator was entitled to a peremptory writ commanding respondent to comply with the order; and from a judgment entered pursuant to the findings, respondent appealed. Reversed.

*Albert E. Clarke*, for appellant.

Rendition of judgment based on the findings of a nonjudicial body like the railroad commission is not due process of law. The right of the commission under Laws 1897, c. 94, to establish stations is limited to villages and boroughs. G. S. 1894, § 1239, defines "village" as meaning a village organized under the general law or

by special charter. Being unincorporated, Emmons is not a village, nor is it a borough. "Borough" means an incorporated town or village. Black, Law Dict.; Webster, Dict.; 2 Am. & Eng. Enc. 478; Borough of West Philadelphia, 5 W. & S. 281; Borough of Little Meadows, 28 Pa. St. 256; Borough of Sewickley, 36 Pa. St. 80. Boroughs have the common-law powers strictly incidental to municipal corporations, and such powers only as their special charters, or the general acts under which they are created, confer. Borough v. Forscht, 23 Pa. St. 391; Commrs. v. Northern, 12 Pa. St. 318, 320; Mayor v. Davis, 6 W. & S. 269; Wartman v. City, 33 Pa. St. 202; State v. Inhabitants, 44 N. J. L. 605; Weed v. Borough, 45 Conn. 170.

Laws 1885, c. 188, § 15, conferring on the commission power to require railroad companies to construct and maintain side tracks for use of shippers between stations ten miles or more apart, has deprived the commission of power to require railroad companies to furnish facilities at shorter intervals. The fact that Norman is without the jurisdiction of the state is immaterial. Neither the courts nor the legislature have jurisdiction to dictate the exact location of the building.

The power of the legislature, as well as of the courts, is limited to the requirements of the locality. When property is taken unnecessarily and without reason, the taking is not due process of law. That the taking is under form of law does not render the act less a violation of the constitution. Chicago, B. & Q. R. Co. v. Chicago, 166 U. S. 226; Missouri Pac. Ry. Co. v. Nebraska, 164 U. S. 403; Cooley, Const. Lim. 356; County of San Mateo v. Southern Pac. R. Co., 13 Fed. 722; Foule v. Mann, 53 Iowa, 42. Laws 1897, c. 94, § 1, does not take into account the necessity of the improvements, does not require an examination or judicial determination of the necessity, and determines arbitrarily that depots and freight rooms shall be provided at all villages and boroughs. The necessity is a judicial question, which the legislature has not the power to determine.

*W. B. Douglas*, Attorney General, *John A. Lovely*, and *Lafayette French*, for respondent.

The legislature has power to make the decision of the commission evidence of the correctness of its conclusion. State v. Chicago, M. & St. P. Ry. Co., 38 Minn. 281; Steenerson v. Great Northern Ry. Co., 69 Minn. 353; Jacobson v. Wisconsin, M. & P. R. Co., 71 Minn. 519. The statute is merely an exercise of the power of the legislature to prescribe rules of evidence. 2 Rice, Ev. pp. 806, 807. A law declaring any evidence prima facie proof of a fact, leaving the adverse party at liberty to overcome it by other evidence, is within that power. Howard v. Moot, 64 N. Y. 262; Chicago v. Jones, 149 Ill. 361; People v. Cannon, 139 N. Y. 32, 36 Am. St. R.,-note; Cooley, Const. Lim. 367.

Laws 1897, c. 94, § 1, is broad enough to include all villages, whether incorporated or such as come within the common definition of the term, and the act should be so construed. Sutherland, St. Const. § 248. "Village" means any small assembly of houses for dwelling or business or both in the country. Webster, Dict.; Standard Dict.; Anderson, Law Dict. 1090; 28 Am. & Eng. Enc. 454–456; Illinois v. Williams, 27 Ill. 48; Toledo v. Spangler, 71 Ill. 568; Bouchard v. Bourassa, 57 Mich. 8; Russell v. Detroit, 80 Mich. 407, 410. That the legislature so understood is evident from its use in connection with "village" of "borough," instead of town or village. But in any case the commission was authorized to make the order under G. S. 1894, § 388, under which it was made. There may be no common-law obligation on the part of a carrier to provide depots or freight houses. Northern Pac. R. Co. v. Washington Ter., 142 U. S. 492; People v. New York, 104 N. Y. 58. But in the absence of statute courts have power to compel establishment of stations. State v. Republican, 17 Neb. 647; People v. Louisville, 120 Ill. 48; Mobile v. People, 132 Ill. 559; Northern Pac. R. Co. v. Washington Ter., supra (dissenting opinion of Brewer, J.). The legislature has conferred on the commission power to determine whether stations shall be located at certain points, and has provided for enforcement by judicial process. Railroad v. Portland, 63 Me. 269; State v. New Haven, 37 Conn. 153; People v. New York, supra; Com. v. Eastern, 103 Mass. 254; 2 Wood, R. § 287c.; 2 Elliott, R. R. § 694; 23 Am. & Eng. Enc. 116. In delegating this power to the commission the state does not transcend its constitutional

power. Stone v. Farmers L. & T. Co., 116 U. S. 307; Chicago & N. W. Ry. Co. v. Dey, 35 Fed. 866; 19 Am. & Eng. Enc. 686. If the findings are prima facie evidence, reasonable necessity is shown. Steenerson v. Great Northern Ry. Co., supra; State v. Republican, 17 Neb. 647. The commission had power to determine the location. G. S. 1894, §§ 388, 2702; Laws 1897, c. 94, § 1.

The legislature has power to regulate the public acts and duties of railroad companies under the police power; and where the subject of legislation is the public part or element of a corporation, the legislative authority does not rest entirely on the police power, but on the right to regulate the acts, business, and duties of public corporations. 2 Elliott, R. R. §§ 662, 663. If the question is a legislative one, the decision is conclusive. Cooley, Const. Lim. (6th Ed.) 707; Tiedeman, Lim. Pol. Power, 593–602. The statute having relation to the public welfare, the legislature has power to determine the necessity of the law, and its judgment is final. State v. Gladson, 57 Minn. 385; State v. New Haven, supra; People v. New York, supra; 2 Elliott, R. R. § 694; 2 Wood, Ry. § 287c.; 23 Am. & Eng. Enc. 116; Com. v. Eastern, supra; Railroad v. Portland, supra. Mandamus was the appropriate remedy. 2 Elliott, R. R. §§ 698, 699.

MITCHELL, J.

The railroad and warehouse commissioners, upon the petition of numerous citizens, and after a hearing at which the railway company appeared and opposed the granting of the petition, made an order requiring the Minneapolis & St. Louis Railroad Company to build and maintain at Emmons, a small, unincorporated village on the line of its road, a station house for the convenience of the public, the outside measurement of which should be 16 feet by 44 feet, and which should contain a waiting room, of the width of the building, and at least 18 feet long, and suitably lighted and heated, for the accommodation of the traveling public, with suitable platforms for the purpose aforesaid, and that the same should thereafter be maintained as a regular station house of the company. The railway company having refused to comply with the order, the state, on the relation of the commissioners, applied to the district court

for a writ of mandamus to compel it to do so.    The railway company appeared and answered to the alternative writ of mandamus. Upon the trial the only evidence introduced by the state was the findings of the railroad and warehouse commissioners.    The railway company introduced no evidence.    The court found, as a conclusion of law, that the relators were entitled to a peremptory writ of mandamus compelling the railway company forthwith to comply with the order of the commissioners, and from the judgment entered accordingly it appealed to this court.

It becomes important, at the outset, to determine whether this action, and the order sought to be enforced by it, are based upon the provisions of Laws 1897, c. 94, or upon the powers granted to the railroad and warehouse commissioners by the general railroad and warehouse commission act (G. S. 1894, c. 6, tit. 9), and particularly section 388.    This depends upon the construction to be given to the word "village," as used in the act of 1897.    That act provides

"That all railroad corporations or companies operating any railroads in this state shall    *    *    *    provide at all villages and boroughs on their respective roads, depots with suitable waiting rooms for the protection and accommodation of all passengers patronizing such roads, and a freight room for the storage and protection of freight.    *    *    *    Such railroad corporations or companies shall at all such depots or stations stop their trains regularly as at other stations to receive and discharge passengers, and, for at least one half hour before the arrival, and one half hour after the arrival, of any passenger train, cause their respective depots or waiting rooms to be open for the reception of passengers; said depots to be kept well lighted and warmed for the space of time aforesaid."

While the word "village" is often used to apply to any small assemblage of houses for dwelling or business, or both, in the country, whether incorporated or unincorporated, yet we are satisfied that the word, as used in this statute, applies exclusively to incorporated villages.    In the first place, the maxim, "Noscitur a sociis," applies. The word "village" is used in connection with the word "borough," which is never applied to any place except an incorporated municipality.    See title "Borough," 4 Am. & Eng. Enc. (2d Ed.).    We have several boroughs created by special charter in the early history of the territory and state, the name having been evidently bor-

rowed from some of the eastern, middle, or border states, such as Pennsylvania, where it is in common use. In the second place, the duties imposed on railroad companies by this act are mandatory, apply to all villages, and are imposed by the legislature itself, and not left to the discretion of the railroad and warehouse commissioners, according as they may or may not determine that public necessity or convenience requires a passenger or freight station to be provided at a particular village. Hence, if the word "village," in this act, is to be given its general popular meaning, as contended for by counsel for the relators, it would be the absolute duty of a railroad company to provide and maintain such a station at every little hamlet along its line, without regard to its size or the amount of its business, and without regard to its proximity to other stations, or to the necessities or convenience of the public. It is not to be lightly assumed that the legislature intended to impose any such onerous and unreasonable duties upon railroad companies. Indeed, it is more than doubtful whether any such act could be upheld as a legitimate exercise of the police power of the state.

If the statute is limited to incorporated villages, the duties imposed are still sufficiently onerous, yet they could be said to have some reference to public convenience; for, to authorize the incorporation of a village, there must be at least 175 inhabitants in a compact or contiguous tract of territory, urban or semiurban, and not strictly rural in its character. G. S. 1894, § 1200; State v. Minnetonka Village, 57 Minn. 526, 59 N. W. 972. And, lastly, if the statute is construed as applying to all villages, in the popular sense, whether incorporated or unincorporated, there is no definite rule by which to determine to what place this mandatory duty of providing a depot and station applies. Who is to determine whether a given place has ceased to be strictly rural, and has become so far urban or semiurban in its character as to be entitled to be called a village, even in the general and popular meaning of that word? The railroad and warehouse commissioners themselves are evidently of opinion that the statute applies only to incorporated villages, and we have no doubt that in this they are correct.

2. But there is no doubt of the power of the commissioners, under the general railroad and warehouse commission act, to require a

railroad company to provide a suitable depot and passenger waiting room at any place, incorporated or unincorporated, where public necessity or convenience reasonably requires it to be done. But this power is neither absolute nor arbitrary. The facts must be such, having regard to the interests, not only of the particular locality, but also of the public at large and of the railroad company itself, as to justify the commissioners, in the exercise of a reasonable discretion and judgment, in ordering the railway company to provide a depot and passenger station at the place in question. Counsel for the relators admit this. The only evidence being the report of the commissioners themselves, we must refer to it to ascertain whether the facts therein stated reasonably justified their order requiring the railroad company to provide and maintain a depot and station at Emmons. The statute provides that,

"Upon the trial of said cause [before the court, as in this case, to enforce the order of the commissioners] the findings of fact of said commission as set forth in its report shall be prima facie evidence of the matters therein stated." G. S. 1894, § 399.

The power of the legislature to establish this rule of evidence is so well settled that we deem it unnecessary to occupy time in argument, or the citation of authorities, in support of the proposition. It will be noted that it is the facts found by the commissioners, and not the conclusions which they draw from those facts, which are made prima facie evidence.

The facts found by the commissioners are, in substance, as follows:

First. That Emmons is on the line of the appellant's road, near the Iowa line, and has a population of about one hundred. It has three stocks of general merchandise, two hardware stores, three blacksmith shops, two restaurants, one furniture store, one drug store, one lumber and coal yard, one grain elevator, one feed mill, one creamery, one butcher shop, one livery stable, and 14 or more dwelling houses; and tributary thereto is a rich and populous agricultural country, which extends to a distance of 15 or 16 miles in a westerly direction, and 5 or 6 miles in other directions. That it is 5 $7/10$ miles from Emmons to the first railroad station on the line

of said railroad north of it, and there is no station on the line of said railroad south of Emmons within the state of Minnesota. That there is a station called "Norman," in the state of Iowa, $7/10$ of a mile by rail, and one mile by wagon road, from Emmons; but said Norman, being within the state of Iowa, is not subject to the jurisdiction or control of this commission.

Second. That the respondent has built and maintains a spur track at Emmons for the reception and delivery of freight in carload lots, but that all business transacted by the people of Emmons, and of the country tributary thereto, with said railroad company, other than loading and unloading car-load freight, under existing conditions, is necessarily to be transacted at Norman; and in consequence thereof the people of Emmons are subjected to much inconvenience, expense, and annoyance, and are required to go without the state of Minnesota, into the state of Iowa, for the transaction of such business.

Third. That during the year ending December 31, 1896, there was shipped from Emmons, on said railroad, butter, on which freight charges were collected amounting to $2,004.69; 101 car loads of grain, on which freight charges were collected amounting to $5,552.88; 74 car loads of live stock, on which freight charges were collected amounting to $3,153.45; three car loads of hay, on which freight charges were collected amounting to $97; and one car load of emigrants' movables, on which freight charges were collected amounting to $16.62,—making the total collection of freight charges on outgoing freight during said time $10,824.64. That during the same period there was shipped to Emmons merchandise, in less than car loads, on which freight charges were collected amounting to $1,199.42; 42 car loads of lumber, on which freight charges were collected amounting to $1,929.24; 33 car loads of coal, on which freight charges were collected amounting to $1,237.58; three car loads of salt, on which freight charges were collected amounting to $186.80; one car load of farm machinery, on which freight charges were collected amounting to $47.70; one car load of wire and nails, on which freight charges were collected amounting to $84.64; two car loads of stone, on which freight charges were collected amounting to $54.62,—making the total collection of freight

charges on incoming freight during said period $4,689.80, and a total of freight charges collected on incoming and outgoing freight during said period of $15,514.44.

"That figures were not furnished this commission for the business of 1897, except on grain shipments up to the time of the hearing, which amounted to 178 car loads, from which we estimate, and so find, that the freight charges for the year 1897 on incoming and outgoing freight at Emmons exceeded $20,000. We are unable to find the receipts of the railroad company upon passenger business at Emmons, for the reason that, under existing conditions at Emmons, passengers, either incoming or outgoing, are required to take the cars or alight therefrom at Norman."

What follows consists merely of inferences and conclusions drawn from these facts.

It is apparent from this that the surrounding country is strictly rural and agricultural, although, as the commissioners say, rich and prosperous; also, that the existing stations on appellant's road (Norman) south and (Twin Lakes) north of Emmons are only 6 $4/10$ miles apart, which the courts will take judicial notice is not greater than the ordinary distance between stations in the rural and agricultural portions of this state. There is no finding that the facilities at the station of Norman for both freight and passenger traffic are not ample for the accommodation of the public.

The only objections found against it are that it is just over the line in the state of Iowa, and hence not subject to the jurisdiction of the relators, and that the people of Emmons and vicinity are compelled to go into the state of Iowa for the purpose of transacting business with the railroad,—considerations which, in our judgment, are not entitled to a particle of weight. It may be unfortunate for Norman that it is not in this state, so as to be subject to the jurisdiction of our railway and warehouse commission; but Iowa is generally supposed to be a civilized state, whose laws provide security for life and property as effectually as our own, and which exercises as efficient police power over common carriers as Minnesota. In trade and commerce, state lines go for nothing. A citizen of Minnesota who goes into Iowa is still in his own country, and has to pay neither a poll tax to enter, nor an import or export

tax on his property. It is commendable in citizens of Minnesota to attempt to build up their own state in every proper way. It is also a commendable ambition on the part of the inhabitants of Emmons to benefit their own village, and themselves individually. But this is no reason why these things should be done at the expense either of the appellant or the public at large. If any such narrow, provincial policy should obtain, every state line in the country would be flanked by double stations at every point where a railroad crossed it.

The suggestion that the station at Norman may be discontinued is frivolous. It will be time enough to take that into account when it happens. It appears that the station at that place is only one mile by wagon road from Emmons. We will take notice that this is shorter than the distance between the dwellings or places of business of a large part of the inhabitants of our larger cities and the railway passenger or freight stations which accommodate them; also, that it is as short as or shorter than the distance between many country depots or stations and the nucleus of buildings constituting the business center of the station village. There is no suggestion that there are any special physical obstacles or difficulties in the way of traveling the one mile of highway between Emmons and Norman. Neither is there any claim that, in locating its stations at Twin Lakes and Norman, the railroad company acted arbitrarily, unreasonably, or in disregard of the convenience of the public.

The aggregate of freight charges on freight going to or from Emmons during a year was $15,514, which at first sight seems like quite a large sum; but, when it is considered that this presumably includes the total freight charges from the places of shipment to the places of consignment, it is apparent that the gross earnings of the appellant on this freight must be a very much less sum, and its net earnings a still much smaller sum. It is also to be observed that the great bulk of this freight, representing at least $12,360 out of the $15,514 freight charges, was shipped in or out in car-load lots, which was already amply accommodated by a side track at Emmons, thus leaving freight representing only $3,154 of the freight charges (assuming that the item of butter was shipped out in less

than car-load lots) which will be benefited by the establishment
of a regular depot or station at Emmons.  And, when the nature
of the freight shipped in car-load lots is taken into account, it
doubtless represents a considerably greater proportion of the bulk
or weight of the total freight than is indicated by its proportionate
share of the freight charges.  The commissioners report that they
were unable, for a very good reason, to ascertain what the receipts
of the appellant upon passenger business at Emmons were or would
be; but it is evident that it would be inconsiderable from the village
itself, and comparatively small even including the rural population
of the so-called "tributary territory," especially in view of the fact
that much of this must be approximately equidistant from one or
the other of the two neighboring existing stations and Emmons.

Our conclusion is that these facts did not justify the commis-
sioners in the first instance, or the district court on appeal, in order-
ing the appellant to provide and maintain this station within seven-
tenths of a mile of an existing station; that, in the light of the facts,
the order was unreasonable.

We are firm believers in the existence as well as the exercise of
the police power on the part of the state over common carriers, but
this power must be exercised reasonably.  Every attempt to exer-
cise it unreasonably only injures public interests, by bringing the
police power of the state into disrepute.  The undue multiplica-
tion of railway stations does not increase the traffic, either passen-
ger or freight.  It simply divides the existing traffic among more
places.  It unnecessarily increases the expense of doing the busi-
ness (which comes out of the railroad company in the first instance,
but at last usually out of the public), diminishes the quality of the
service of the road to the public by the unnecessary frequency of
the stops of trains, and increases to some extent the hazards of rail-
road traffic and travel.  As already suggested, in determining
whether a station should be provided and maintained at a par-
ticular place, the interests, not merely of that immediate locality,
but also of the railroad company, and especially of the public at
large, must be taken into consideration.  It seems to us that the
commissioners, in making this order, must have been unconsciously
influenced by the fact that the station at Norman was on the other

side of the state line, and that, if it had been on this side, they would never have ordered the appellant to provide another station within seven-tenths of a mile of it.

Judgment reversed, and a new trial granted.

BUCK, J. (dissenting).

A large number of citizens of the county of Freeborn, in this state, living in and adjacent to the village of Emmons, in said county, petitioned the board of railroad and warehouse commissioners of this state to direct and require the Minneapolis & St. Louis Railroad Company, a corporation of this state, to erect and maintain a railroad depot at the said village of Emmons, in said county, as provided by law, and for the convenience of its passengers, and receiving and delivering freight, and generally for the convenience and necessities of the traveling public, and the shippers of produce at the said village of Emmons and its vicinity. In their petition, the facts upon which it was based were set forth, and the railroad company answered and made return to said petition in contesting the same. The matter came on for hearing on November 26, 1897, and, the cause having been duly heard, the commission made an order, bearing date February 1, 1898, requiring said railroad company to build and maintain a station house for the convenience and accommodation of the public and people of Emmons, and the country tributary thereto, doing business with said railroad company, and in said order designating the premises whereon said station house should be built, and the size of said house and waiting room therein, and requiring it to be suitably heated and lighted for the accommodation of the traveling public at Emmons. Said order also required said station to be properly provided with suitable platforms for the purposes aforesaid, and all to be constructed and completed for public use on or before April 15, 1898, and thereafter to be regularly maintained by said company as a regular station house. The railroad company refused to comply with this order in each respect, and thereupon the commission applied to the district court for the county of Freeborn for an alternative writ of mandamus to compel the railroad company to comply with said order, or show cause why it should not do so. Thereafter the cause

was tried without a jury, at a general term of the district court at Freeborn county, on December 19, 1898. After hearing the evidence, and duly considering the same, the court made and filed its findings of fact and law, and, among other things, found that the respondent herein was entitled to a peremptory writ of mandamus as prayed for, and ordered judgment accordingly; and on January 7, 1899, judgment was duly entered by said district court, and from the judgment the defendant railroad company appeals.

The commission's findings were substantially as follows:

"First. That Emmons is a laid-out and platted, but unincorporated, village, situated on the line of the Minneapolis & St. Louis Railroad, near the Iowa state line, in said Freeborn county, and has a population of about one hundred. That at said village there are three stocks of general merchandise, two hardware stores, three blacksmith shops, two restaurants, one furniture store, one drug store, one lumber and coal yard, one grain elevator, one feed mill, one creamery, one butcher shop, one livery stable, and 14 or more dwelling houses, and tributary thereto is a rich and populous agricultural country which extends to a distance of 15 or 16 miles in a westerly direction, and five or six miles in other directions. That it is 5 $7/10$ miles from Emmons to the first railroad station on the line of said railroad north of Emmons, and there is no station on the line of said railroad south of Emmons within the state of Minnesota. That there is a station called 'Norman,' in the state of Iowa, $7/10$ of a mile by rail, and one mile by wagon road, from Emmons; but said Norman, being within the state of Iowa, is not subject to the jurisdiction or control of this commission.

"Second. That the respondent has built and maintains a spur track at Emmons for the reception and delivery of freight in car-load lots, but that all business transacted by the people of Emmons, and of the country tributary thereto, with said railroad company, other than loading and unloading car-load freight, under existing conditions, is necessary to be transacted at Norman; and in consequence thereof the people of Emmons are subjected to much inconvenience, expense, and annoyance, and are required to go without the state of Minnesota, into the state of Iowa, for the transaction of such business.

"Third. That during the year ending December 31, 1896, there was shipped from Emmons, on said railroad, butter on which freight charges were collected amounting to $2,004.69; 101 car loads of grain, on which freight charges were collected amounting to $5,552.88; 74 car loads of live stock, on which freight charges were collected amounting to $3,153.45; three car loads of hay, on which

76 M.—31

freight charges were collected amounting to $97; and one car load of emigrants' movables, on which freight charges were collected amounting to $16.62,—making the total collection of freight charges on outgoing freight during said time $10,824.64. That during the same period there was shipped to Emmons merchandise, in less than car loads, on which freight charges were collected amounting to $1,199.42; 42 car loads of lumber, on which freight charges were collected amounting to $1,929.24; 33 car loads of coal, on which freight charges were collected amounting to $1,237.58; three car loads of salt, on which freight charges were collected amounting to $186.80; one car load of farm machinery, on which freight charges were collected amounting to $47.70; one car load of wire and nails, on which freight charges were collected amounting to $84.64; two car loads of stone, on which freight charges were collected amounting to $54.62,—making the total collection of freight charges on incoming freight during said period $4,740, and a total of freight charges collected on incoming and outgoing freight during said period of $15,564.64. That figures were not furnished this commission for the business of 1897, except on grain shipments up to the time of the hearing, which amounted to 178 car loads, from which we estimate, and so find, that the freight charges for the year 1897 on incoming and outgoing freight at Emmons exceeded $20,000. We are unable to find the receipts of the railroad company upon passenger business at Emmons, for the reason that under existing conditions at Emmons, passengers, either incoming or outgoing, are required to take the cars or alight therefrom at Norman.

"Fourth. It is further found that the business of said railroad company originating and terminating at Emmons is of sufficient magnitude, and sufficiently profitable to said respondent, and the needs and necessities of the people at Emmons, and of the country tributary thereto, are of sufficient public importance, to authorize and require the said respondent to build and maintain a station house at Emmons for the accommodation of the public, and of the people at Emmons and the country tributary thereto. And it is further found that there is a suitable location for said station house upon the present right of way of said respondent at the point and upon the property hereinafter described, and that a station house built and maintained thereon will afford suitable and convenient facilities for said people."

The first question discussed by counsel for appellant relates to the sufficiency of the evidence to authorize the judgment. The only evidence offered was the findings and order of the railroad and warehouse commission, which we have just quoted. The railroad company offered no evidence. G. S. 1894, § 399, provides that

"On such hearing the findings of fact on the part of such commission shall be prima facie evidence of the matters therein stated."

The rule that such findings are only prima facie evidence implies that such evidence may be contradicted or rebutted, if done by competent evidence. But the railroad company does not attack the findings as untrue. It is the insufficiency of the evidence, not its falseness, which it assails. But the facts found by the commission made the matter clear and easily understood. There could be no reasonable doubt but what the findings of fact by the commission were evidence of the matters therein stated. The matters in dispute were alleged by one party and denied by the other. The findings of fact were plain, direct, and positive, and relevant to the issue. Because the statute makes the findings of the commission prima facie evidence in the first instance does not bar such findings from being conclusive, if they are not controverted, rebutted, impeached, or in any manner assailed. Prima facie evidence is such as, in judgment of law, is sufficient to establish the fact, and, if not rebutted, remains sufficient for the purpose. Kelly v. Jackson, 6 Pet. 632. In other words, it is sufficient proof of the particular facts until overcome by other competent evidence. It is a general rule that prima facie evidence may be contradicted, but if competent, and composed of such a body of facts as, standing alone and uncontradicted, may and ought to convey conviction to the tribunal hearing it, it should be regarded as conclusive in its character. Conclusive evidence is "such evidence as, being uncontradicted, controls the decision." Anderson, Law Dict. 421.

Of course, having only prima facie evidence in the first instance, it left the defendant at liberty to rebut it, and thus save its rights which it could show it had as against the respondent's claim. By omitting to offer any proof or make any defense by way of introducing evidence, the prima facie proof of respondent becomes conclusive,—something which the legislature could not do in the first instance, as it might indirectly work a confiscation of property or destruction of vested rights. It is to be noted that the defendant had ample opportunity on the hearing before the railroad and warehouse commission, and on the trial before the district court, to have introduced any competent evidence in its be-

half to rebut that of the respondent herein; but it omitted to do so, and saw fit to rest its case upon its denial in its answer to the petition, and in its answer and return to the alternative writ of mandamus. No complaint is made that the evidence obtained in this case upon which the commission based its findings and order was illegal or incompetent, but that it was insufficient on the trial in the district court. This court held in Steenerson v. Great Northern Ry. Co., 69 Minn. 353, 72 N. W. 713, at page 376, that

"Ordinarily, on appeal from one tribunal to another the evidence on which the lower tribunal acted is returned, and the decision is reviewed in the light of that evidence. But the commission need not base its decision wholly on any such evidence. It is not a judicial tribunal, but an administrative body, whose powers are somewhat legislative in their character; and, like other administrative or legislative bodies, it acquires a knowledge of the facts, circumstances, and conditions in its own way, and need not act on the theory that the parties should have a formal hearing on notice, except so far as the statute expressly so requires."

The evidence upon which the commission made its findings was obtained by the commissioners acting under oath to support the laws and faithfully discharge their duties, with power to administer oaths. Each commissioner was also under bonds of $20,000 for the faithful performance of his duty. The attorney general is required to give them counsel and advice as they may from time to time require. Thus, while the commission is acting as an administrative body, and may acquire a knowledge of the facts, circumstances, and conditions in its own way, it is not an irresponsible tribunal, but one acting under the obligation and sanctities of official oaths. And the presumption is that the commissioners, in obtaining evidence, only secure such as is competent and relevant to the issue submitted to them. Upon such evidence they base their findings of fact in their report, which becomes, under the statute, competent and prima facie evidence of the facts therein stated, and the burden rests upon the appellant to show that their acts were contrary to law. The statute does not deprive the appellant of the right to have a judicial determination before a court of general judisdiction of the findings of the commission. Such findings can be reviewed, and their falsity or insufficiency there be deter-

mined.  If the railroad company choose to default in this respect, and permit the findings of the commission to stand as prima facie or conclusive evidence upon the matters therein stated, it must abide the consequences.  Remaining passive when it might exercise its rights gives no authority to say that the power does not exist, for it does exist, and the district court may review the findings of fact as well as questions of law.

The legislature has an undoubted right to change the rules of evidence, and make them applicable to existing causes of actions as well as to future rights and controversies, especially if the right to be heard before a competent tribunal exists or is reserved, and vested rights are not interfered with.  See 2 Rice, Ev. pp. 805–807. These rules pertain to the remedy, and are under the control of the legislature, which has the right to regulate the proceedings in the trial of actions, so long as such regulations are impartial and uniform, and do not preclude the party from establishing his rights, although they may affect such rights incidentally.  In People v. Cannon, 139 N. Y. 32, 34 N. E. 759, it was held that the state legislature has power to enact that, even in criminal actions, where certain acts have been proved, they shall be prima facie evidence of the main fact in question, if the accused have a fair chance to make his defense and to submit the whole case to the jury.  In Rich v. Flanders, 39 N. H. 304, it was held that a statute changing the rules of evidence or of practice is ordinarily to be classed with those affecting the remedy, and, though made to operate upon suits pending at the time of its passage, is not unconstitutional, unless it impairs contracts or destroys vested rights.

The trial court therefore did not err in admitting in evidence the findings of facts in the report of the railroad and warehouse commission, and making its findings solely upon such evidence.

2. It is contended by the appellant that the order of the railroad and warehouse commission was unauthorized and void; that Laws 1897, c. 94, § 1, limits the right of the commission to establish stations at villages and boroughs; that the term "village," as therein used, should be held to mean a village organized under the general laws of the state or by special charter; that the village of Emmons, not being incorporated under the general law, is not a vil-

lage, within the meaning of the statute requiring the establishment of stations at villages. G. S. 1894, § 1239, cited by counsel for appellant, provides that the term "village," as therein used, shall be held to mean a village organized either under a general law or by special charter. The act of which this section forms a part is found in chapter 10 of the General Statutes, relating to the organization of towns, cities and villages; and I do not think that it has any application to the word "village" as found in Laws 1897, c. 94, § 1, which provides that all railroad corporations or companies operating railroads in this state shall provide, at all villages on their respective roads, depots, with suitable waiting rooms for the protection and accommodation of all passengers patronizing said roads, and freight rooms for the protection and storage of freight. This language is broad enough to include all villages, whether incorporated or not, and I have no doubt but that such was the intention of the legislature in the enactment of the law.

Emmons is a laid-out and platted village, but unincorporated, and has a population of about one hundred persons. At said village there are three stores of general merchandise, two hardware stores, three blacksmith shops, two restaurants, one furniture store, one drug store, one lumber and coal yard, one grain elevator, one feed mill, one creamery, one butcher shop, one livery stable, and 14 or more dwellings. The facts are sufficient to constitute a village, within the well-known definition of the word as given by lexicographers, and judicially determined by the courts. "Village. An assemblage of houses in the country, less than a town or city." Webster, Unabridged Dict. 1476. "Any small assemblage of houses for dwelling or business, or both, in the country, whether situated upon regularly laid-out streets and alleys or not." Anderson, Law Dict. 1090. In Toledo v. Spangler, 71 Ill. 568, it was held that a place where there was a station house, warehouse, stores, blacksmith, and post office, and five or six dwelling houses, was a village. Doubtless, if the facts constituted Emmons a village, within these definitions, it would be sufficient; but it is a laid-out and platted village, situate upon the line of defendant's road, and its location definite and certain, and the exact place where the station should be located easily ascertained, and definitely fixed by the

commissioners.  If Emmons is a village, within the meaning of the law, it is not so essential that it be a large one, as that its railroad business, created or brought about by its people and those living in the vicinity and in the country tributary thereto, is sufficient and of such a character as to warrant the order of the commission in directing the defendant to build and maintain a suitable station house for the convenience and accommodation of the people doing business at Emmons with said railroad company.  I think that the evidence is ample to show the magnitude of the business done there, and the reasonable necessity for such station.

The mere fact that it appears that there is a railroad station at Norman, Iowa, within one mile of Emmons, is not sufficient to overthrow the decision of the commission as to the necessity for a station at Emmons.  While I do not regard the fact that Norman is situate in the state of Iowa as material, I do not overlook the fact that it does not appear that it is even a village or city, and there is nothing to show but what the station there might at any time be abandoned by the railroad company without rendering the company liable for so doing.  The trial court found as a fact that the people residing at the village of Emmons and vicinity are now compelled to transact all of their business with the railroad company, other than done by car-load lots, at the said station of Norman, and in consequence thereof are subject to much inconvenience, expense and annoyance.  This finding is important, in view of the fact that it nowhere appears what are the facilities at Norman for doing railroad business.  The railroad company neglected or refused to show what such facilities were.  There is a large, well-settled, and fertile agricultural country tributary to Emmons; and I think that the commission and trial court were fully justified in holding that citizens of our own state should not be compelled to go to another state to do business, when in so doing they were subject to much inconvenience, expense, and annoyance, which might be obviated by building the station house at Emmons, and where the business, annually increasing, would justify them in so doing.

3.  Counsel for appellant complain that the order of the railroad and warehouse commission determines and directs the railroad com-

pany to build a station house upon a certain and exact location, and assert that the defendant has the absolute right to exercise its own judgment as to the proper point and place for erecting stations and buildings upon its own railroad, without regard to the legislature or courts.    This claim is, I think, unsound.

The defendant does not propose to build anywhere, either at an exact location or elsewhere, and defies both the legislative and judicial branches of the state government.    It does not show that the location is an improper one, or that it would be unreasonably expensive or inconvenient.    If the order was not specific and definite as to location of the station house and its dimensions, it would doubtless be met with the objection that no place had been designated by the commission where to construct the station, and, hence, that the court would be powerless to enforce the order by mandamus.    The order of the trial court also provides for enforcing the findings and order of the commission by mandamus, as to building a suitable station house at the place designated in the order of the commission.    The railroad company having refused to comply with the order of the commission, it had the right, in its discretion, to cause a suit or proceedings to be instituted to enforce its order.    G. S. 1894, § 388.    I do not wish to be understood as holding that the board of railroad and warehouse commissioners has the power arbitrarily to compel the railroad company to establish stations whenever and wherever it may be its pleasure, and where not required by public interests, but only where a reasonable necessity exists for so doing, and when this appears after an opportunity to be heard before a court of general jurisdiction.    That was the course pursued in this case, and for enforcing the order mandamus is the proper remedy, but it must be specific and mandatory.    I am of the opinion that the judgment should be affirmed.