[File No. 6411.]

IN THE MATTER OF THE PETITION OF PATRONS OF THE GREAT NORTHERN RAILWAY COMPANY OF NASH, NORTH DAKOTA, for Agency Service the Year Around, and for a New Depot Building, Case No. 3420.

C. LILLEGARD, Joe Thompson, John Wahl, Henry Munson, Frank Anderson, and Donald Dike, Respondents, v. GREAT NORTHERN RAILWAY COMPANY, a Corporation, Appellant.

(267 N. W. 723.)

Opinion filed June 13, 1936.

*Murphy, Toner, & Kilgore,* for appellant.

*J. A. Heder,* Commerce Counsel for Board of Railroad Commissioners, *P. O. Sathre,* Attorney General, *T. I. Dahl,* State's Attorney of Walsh county, for the respondents.

BURKE, Ch. J. Residents in the vicinity and trading territory of Nash, Walsh county, North Dakota petitioned the Board of Railroad Commissioners to order the Great Northern Railway Company to furnish an agent at Nash station for twelve months in the year and to provide a new depot at said station. A hearing was thereafter had on which testimony was taken for the petitioners and for the Great Northern Railway, and the record made at a hearing upon a petition dated April 5, 1926, petitioning for a new depot at said town of Nash, was received in evidence and considered by the said Board of Railroad Commissioners.

Thereafter findings of fact and conclusions of law were duly made, upon which an order was made as follows to wit:

"We have given careful consideration to all facts having a bearing on this case and are of the opinion and find that the Great Northern Railway Company should maintain an agency at Nash continuously; that it should include in its budget for 1935, a sufficient sum to provide for the construction of a so-called 'standard' depot at Nash and such depot should be completed not later than July 1st, 1935, plans to be submitted to and approved by this Commission prior to beginning of construction. . . ."

On appeal to the district court the findings of the Board of Railroad

Commissioners were duly approved and judgment was entered thereon, from which judgment an appeal was duly taken to this court.

The issues involved are

"1. Whether there was any real necessity for a year around agent at Nash or a new depot building;

"2. Whether or not the findings of the Commission are not against the weight of the evidence;

"3. Whether or not the Commission did not decide certain questions that were not included in the petition and certain questions over which the Commission at that time had no jurisdiction."

Nash is on the Grafton Junction-Morden Branch of the Great Northern, 5.73 miles west of Grafton Junction by rail. The nearest open stations are Grafton, 6.47 miles to the east, and Hoople, 7.19 miles to the west by rail. Highway mileage is ten to twenty per cent greater.

D. K. Dike, witness for the respondents, testified that the population of Nash was about twenty or twenty-five. There are three elevators, one store, and a potato warehouse. No lumber yards. The twenty-five include men, women, and children; that is an estimate.

Thomas A. Shur, testifying for the defendant, states: "Nash has one general merchandise store, postoffice included, three elevators, a potato warehouse, and the office scale building in connection with the warehouse, a coal shed, a residence that is occupied by the storekeeper, who is also postmaster, a residence occupied by the manager of the Nash Elevator Company, a residence that is occupied by the manager of the Nash Grain and Trading Company, a residence owned by the St. Anthony and Dakota Elevator Company, a residence that is occupied by a retired farmer, and the Great Northern Depot. The total estimated number of inhabitants would be thirty-two at that time, which included some floating population; that is, potato pickers and men working in the potato warehouse, which increased the population for the time being at this time of year."

Nash is a very small place; but it is in the center of a very fertile agricultural community. The trade territory, according to the findings of the railroad commission, is from six to six and a half miles north, south, and west, and three and a half miles east. Practically

all of the land in the territory is under cultivation. A very heavy acreage is planted to potatoes and sugar beets, and seventy per cent of all the products in this territory is shipped over the Great Northern Railway from the station at Nash.

Mr. McCandless, a division superintendent of the Great Northern Railway upon which Nash is located, stated: "For 1931 the total revenue was $53,416, of that $2,006 comes from carload freight received, $240 from LCL received, $50,908 from carload freight forwarded, $51 from LCL forwarded, $65 from passenger business, $112 from Western Union, and $33 from milk and cream. During 1932 the total revenue was $34,258. Of this $1,112 came from carload shipments received, $306 from LCL received, $32,530 from carload freight forwarded, $106 from LCL forwarded, $40 from passengers, $18 from express, $106 from Western Union, and $39 from cream and milk. During 1933 the total revenue received was $73,794. Of this $2,005 was from carload freight received, $551 from LCL received, $70,845 from carload freight forwarded, $55 from LCL forwarded, $26 from passengers, $120 from express, $162 from Western Union, and $28 from milk and cream. During 1934 the total revenue received was $22,121. Of this $2,323 was from carload freight received, $305 from LCL received, $19,237 from carload freight forwarded, $80 from LCL forwarded, $34 from passengers, $55 from express, $75 from Western Union, and $10 from milk and cream. The big part of the revenue is from the carloads of potatoes shipped out. The expense of maintaining agency service is about $125 a month. Custodian service costs not to exceed $20 a month. We are trying to economize and cut down operating expenses at Nash and elsewhere. Our passenger business is practically nil. The facilities of a depot at Nash were put in, according to our record, on an order from the Commission back in 1926 or 1927. The depot at the present time is what has been called in the past a portable depot, about 12 x 34, having a small warehouse space in one end, telegraph table, office for agent in center of building, and a small waiting room on the other end. We have a number of other stations where the facilities are the same as at Nash and undoubtedly where the LCL freight is heavier than at Nash."

It will be seen from this undisputed statement of the superintendent that nearly all of the freight business at Nash is in carload lots, the

shipping of potatoes, sugar beets, and grain, and that the passenger traffic and the LCL business is very light.

After a hearing had on March 17, 1926, the record of which has been introduced in evidence in this case and duly considered by the board, the board made a finding as follows: "Passenger business shows a gradual decline for the 32 month period, from an average of 40 passengers per month in 1924 to 12 per month in 1926, and the earnings from $19 per month in 1924 to $6.57 in 1926, a decrease of about 66%. This is due, no doubt, to improvement to the highways in the Nash vicinity and the poor passenger accommodations furnished by the Great Northern at that point."

On that hearing the board denied the petition for a new depot; but required the railroad company to make such improvements in its depot at Nash to make it comfortable for its agent and passengers during the winter months, such improvement to be made on or before September 1, 1927 and providing and requiring the railroad company to keep an agent at Nash from August 15 of each year until May 15 of each succeeding year. Custodian service to be maintained in the meantime.

In the findings in the instant case the railroad commissioners quote at length from the hearing of the case heard in 1926, and in the findings in the instant case state, "Conditions at Nash, in so far as necessity for Great Northern station service is concerned are about the same as in 1926, with these exceptions: Grain marketing begins in July, potato shipments January to May of each year steadily increasing, and average monthly earnings have increased from $2,463.33 for the 32 month period ending August 31st 1926 to $3,824.80 for the 40 month period ending May 10th, 1934. Wheat marketing has been speeded up by the raising of earlier maturing varieties and increased use of combines; spring shipments of potatoes have increased because of extension of seed potato market, and the increase in earnings is due, . . . to the increased traffic handled at the station."

Nearly all of the testimony introduced by the respondents relates to the inconvenience in shipping to and from Nash in the absence of an agent.

Section 4656, Compiled Laws 1913, provides: "Every railroad corporation in the state of North Dakota shall build a station house

and keep a station agent twelve months each year when so ordered by the railroad commissioners at all of its sidings where there is grain and merchandise of any description to be shipped, when the outgoing and incoming freight, and all other receipts at said station amounts to twelve thousand dollars or more in any one year."

According to the statement given to the railroad commissioners by the defendant the receipts from the outgoing and incoming freight at Nash are far in excess of what the law requires for the maintenance of a station agent twelve months each year and the order of the railroad commissioners providing for a station agent at Nash for the twelve months in the year must be affirmed.

The Great Northern at Nash, however, has a station house and the conditions, according to the findings of the railroad commission in the instant case, "are about the same as in 1926, with these exceptions: Grain marketing begins in July, potato shipments January to May of each year steadily increasing;" but this freight is in carload lots. The grain is loaded into the cars from the elevators and the potatoes from the warehouse and does not in any way increase the necessity for a depot different from what the company has at Nash.

Respondents' brief quotes at length from the testimony upon which respondents rely; but it all relates to the inconvenience of service without an agent. The only testimony on the necessity of building a new depot is the testimony of Mr. Dike, who testified: "For passengers there is no depot and it is not suitable at all for kids and women. They have to stay over at the store and watch for the train. I have taken my wife and kids over there. Sometimes it is so you can stay in it, but if it is a bad winter it is hard to keep it suitable. It is about the size of a box car. I do not know what kind it is. There is a stove in it. On one side there is a bench runs about eight to ten feet. The depot is divided so there is a place for passengers and for freight. In the winter time you cannot keep it warm in there no matter how hot you keep the stove. I do not think it safe to store anything perishable in there."

Mr. Lillegard testified: "One thing, there is no place to stay for an agent. No place to room or board. My business is all carload lot. I am not inconvenienced myself personally."

One witness testified that a bale of potato sacks shipped to him was left upon the platform and was covered by drifting snow, although this same witness testified that he had a warehouse himself within 400 feet of the depot and had truck service but couldn't use it in the winter on account of the drifts. No claim was made that the sacks were damaged or that they could not have been put in the warehouse at the depot. In fact, the evidence was offered to show the necessity of an agent to look after the freight at the station.

In the case of Barnard v. Chicago & N. W. R. Co. 39 S. D. 623, 166 N. W. 148, the South Dakota court held that the order of the Board of Railroad Commissioners to defendant to provide a suitable station house in place of two box cars and maintaining an agent at a town of forty inhabitants, with two stores, lumber yard, coal yard, blacksmith shop, and insurance office in a farming community, and which in the year previous the company transacted $10,000 of business, $7,000 of which was in car lots, examined and held that such order was reasonable as to the maintenance of agent, but that the evidence was insufficient to show depot facilities inadequate. The court said: "The evidence does not show that the box car that is used as a freight depot is not sufficient to house and protect all the less than carload lots of freight that is shipped in and out of said station, nor that the one that is used as a passenger depot cannot be made comfortable for passengers while waiting for trains."

In the instant case the evidence shows a gradual falling off on the local business and an increase in the outgoing business. It does not show that the facilities of the present portable station at Nash cannot be made comfortable for passengers and that the facilities of the warehouse part are not sufficient to take care of local freight.

In the case of Vicksburg, S. & P. R. Co. v. Railroad Commission, 132 La. 193, 61 So. 199, Ann. Cas. 1914C, page 1168, an order of the railroad commission directing a railroad company to erect and maintain a standard passenger and freight depot, with a regular agent in charge, in a small town or village, already provided with a flag station and freight shelter, will be held to be unreasonable, where this evidence shows that for nearly three years the passenger traffic has averaged per day 1½ passengers, and 80 cents for fares, and that shipments of

freight have been restricted to carload lots handled from the headquarters of the railroad company in an adjoining city.

In the case of State ex rel. Railroad & W. Comrs. v. Minneapolis & St. L. R. Co. 76 Minn. 469, 79 N. W. 510, Judge Mitchell speaking for the Minnesota court said: "But there is no doubt of the power of the commissioners, under the general railroad and warehouse commissioner's act, to require a railroad company to provide a suitable depot and passenger waiting room at any place, incorporated or unincorporated, where public necessity or convenience reasonably requires it to be done. But this power is neither absolute nor arbitrary. The facts must be such, having regard to the interests, not only of the particular locality, but also of the public at large and of the railroad company itself, as to justify the commissioners, in the exercise of a reasonable discretion and judgment, in ordering the railway company to provide a depot and passenger station at the place in question." See Alabama G. S. R. Co. v. Alabama Pub. Serv. Commission, 210 Ala. 151, 97 So. 226; Vicksburg, S. & P. R. Co. v. Louisiana Pub. Serv. Commission, 160 La. 1028, 107 So. 894; Vicksburg, S. & P. R. Co. v. Railroad Commission, 132 La. 193, 61 So. 199, Ann. Cas. 1914C, 1168, supra; State ex rel. Wabash R. Co. v. Public Serv. Commission, 271 Mo. 155, 196 S. W. 369; St. Louis, S. M. & S. R. Co. v. State, 28 Okla. 372, 111 P. 396, 114 P. 1096.

The building of the standard depot at Nash would cost from $3,500 to $4,000, and we are of the opinion that on the showing made the order, insofar as it requires the building of such depot, is arbitrary, unreasonable, and must be reversed. The railroad commissioners, however, have continual jurisdiction over the said branch line of railway, and may at any time, after a hearing, require the said railroad company to provide adequate, comfortable station house facilities to meet the necessities of increased business, if the evidence at such hearing justifies such an order.

The order of the commissioners requiring the building of a new standard depot at Nash is reversed, and the order requiring the maintenance of a station agent at Nash for twelve months in the year is affirmed.

BURR, NUESSLE, MORRIS and CHRISTIANSON, JJ., concur.