KANSAS CITY, M. & O. RY. CO. v. STATE, et al.

No. 1133.   Opinion Filed March 8, 1910.

(107 Pac. 912.)

1.   CORPORATION COMMISSION—Review of Findings—Presump-
tions.   All actions of the Corporation Commission appealed from
having been made by the Constitution prima facie just, reason-
able, and correct. the Supreme Court. when called upon to review
such actions, will ascribe to the findings of the commission the
strength due to the judgments of a tribunal appointed by law
and informed by experience.   And in any special case of conflict-
ing evidence a probative force must be attributed to the findings
of the commission, which, in addition to knowledge of conditions,
of environment, and of transportation relations, has had the wit-
nesses before it and has been able to judge of them and their
manner of testifying.

2.   SAME—Review of Orders—Burden of Proof.   On appeal from an
order of the Corporation Commission, the presumption obtains,
by reason of section 22, art. 9, of the Constitution, that the ord-
er is reasonable, just, and correct and he who complains on ap-
peal of such order has upon him the burden of establishing the
unreasonableness, unjustness, or incorrectness of such order,
which he may do by showing that the unreasonableness of the
order appears affirmatively from the facts as certified by the
commission, or that it is shown by evidence in the record, upon
which the commission failed to make findings of fact, or upon
which the commission erroneously found the facts

(Syllabus by the Court.)

*Appeal from State Corporation Commission.*

Action by the State and others against the Kansas City,
Mexico & Orient Railway Company.   From an order of the State
Corporation Commission requiring defendant to maintain a de-
pot at a certain place, defendant appeals.   Affirmed.

*Geo. E. Black* and *John Embry,* for appellant.

*Chas. West,* Atty. Gen., *Geo. A. Henshaw,* Asst. Atty. Gen.,
and *S. B. Oberlander,* for appellees.—Citing: *Commw. v. Rail-
way Co.,* 102 Mass. 258; *R. R. Comm'rs v. Railway Co.,* 63 Me.
259; *Railroad Co. v. Minnesota,* 193 U. S. 52; *R. R. Co. v. Inter-
state Com. Com.,* 206 U. S. 441.

KANE, J.   This is an appeal from an order of the Corporation Commission.   The opinion and order of the commission, by Love, chairman, fairly states the case as presented by the pleadings, and established by the evidence, as follows:

"The complainants filed a petition asking that the defendant be required to establish a depot and maintain the same, also to establish side tracks and stockyards at the station of the defendant known as 'West Cleo.'   The defendant filed an answer alleging that the town of Cleo is on the Rock Island Railway, and that this road is supplied with proper passenger and freight depots and facilities, that the respondent's road is 1½ miles from Cleo, and that it maintains a passenger and freight depot at the town of Aline, 7 9-10 miles north of Cleo, and at Orienta, 2 5-10 miles south of Cleo; and further alleging that the passenger and freight business of the town of Cleo would be insufficient to maintain a station without loss to the company.   It further alleges that the entire line in Oklahoma is operated at a loss.   The commission finds from the evidence that the 'Orient' Railway was constructed about 1¼ miles west of the town of Cleo about 4 years ago; that the Rock Island Railroad was built through the town of Cleo some 10 or 12 years ago; that Cleo is one of the oldest towns in that section of the country, has a population of between 500 and 600 people, and is the principal trading point in that immediate section within a radius of 10 or 12 miles; that at the time the 'Orient' Railway was constructed, instead of putting a depot at Cleo, it established a depot and facilities 2½ miles south of West Cleo, and about ½ mile south of the Cimarron river.   It is further shown from the evidence that the principal part of the shipments made from Orienta are by citizens living at Cleo.   Some shipments are made from Aline, which is eight miles north of Cleo.

"The passenger receipts, as testified to by the clerk to the auditor, show that fares paid from Cleo to other points on the line of defendant and tickets sold from points on this line to Cleo for five months ending June 30, 1909, in and out, amounted to $1,259.12.   This statement does not show the receipts for passenger tickets sold beyond the defendant's line, a part of the proceeds of which this line earns.   It is also shown from the evidence that the freight receipts for shipments into West Cleo are very light; that no freight can be shipped out of Cleo under the

present arrangement. It is therefore difficult to estimate what the total receipts of this office would be had it ample and sufficient facilities to care for the business. It is always safe to estimate that the freight receipts amount to from two to three times more than the passenger receipts. The merchants at Cleo testified that they quit having shipments come in over the 'Orient' about one year ago, owing to the difficulty and inconvenience of having some one at the station waiting for the arrival of the trains; that the direct markets for their supplies were Wichita and Anthony, Kan.; that it takes a shipment six days to come from Wichita to Cleo over the Rock Island and two days over the 'Orient,' and from Anthony, Kan., shipments are received the same day they are forwarded. It appears from the evidence that much broom corn would be shipped from Cleo over the 'Orient' that now goes over the Rock Island, if there were depot facilities. One shipper of live stock who ships more than 52 cars annually to Wichita, Kan., which now go over the Rock Island, said these shipments would be exclusively over the 'Orient' had it facilities for loading the same at Cleo. That the 'Orient' is more desirable as a shipping route on account of having a direct six hours' run into Wichita. That the shipments of 52 cars of stock would amount to $3,500 in freight annually. That the business of the 'Orient' road is such that it would require but very little additional cost and no additional equipment to take care of this business, and it appears to the commission that, owing to the lack of facilities at Cleo, the 'Orient' is now actually losing from $3,000 to $5,000 worth of business annually which goes to the Rock Island. In competitive territory, it is naturally the custom of railroads to establish stations and furnish facilities at every accessible place, regardless of distance, and, Orienta being south of the river, it doubtless occurred to this railroad company, by establishing a station there, the business that it received from the place would in a large measure go to the Rock Island at Fairview and other points.

"The commission further finds from the evidence it would cost about $3,000 or $3,500 to establish sufficient and suitable depots at West Cleo, with ample switch-track facilities and good and sufficient stock pens and shipping facilities. That the interest on this amount would be about $200 annually. That it costs about $1,000 a year to maintain a station of the kind and character required at Cleo. That the gross total expense and interest

on the investment would not exceed $100 per month. For this outlay of money the defendant, according to the evidence in this case, would receive about $3,500 worth of live stock shipments, which would move entirely over its road. That it would probably receive from $1,200 to $1,500 in broom corn shipments that is shipped from other points. That it would receive from $1,000 to $1,200 in-bound freight shipments and several hundred dollars of local out-bound shipments that it does not now receive. If this evidence can be relied upon, from a purely business standpoint, this railroad should establish facilities. When the facts and circumstances are considered in this case, this being an old-established town, the people of the vicinity accustomed to going there to trade, cut off by the Cimarron river from going to Fairview at certain seasons of the year, there being no substantial trading point at Orienta, the commission is of the opinion that the reasonable necessities and conveniences of the people at Cleo and vicinity require that the defendant build a depot, establish switch tracks and stock pens for the purpose of shipping stock at the town of Cleo, and that the depot should be maintained with an agent, and that passenger trains should be bulletined as at other stations.

"It is therefore ordered that the defendant, the Kansas City, Mexico & Orient Railway Company, erect a depot at its station at West Cleo, and sufficient amount of switch tracks for the reasonable necessities of the people; that stock pens and facilities for loading cattle shall be built at some accessible place; that the depot be maintained by the installing of an agent; that all business be transacted at this station as at other stations of similar size and character on the defendant's line of road; that the plans and specifications for said depot shall be submitted to the commission by the 1st day of May, 1910; that said depot be completed by September 1, 1910; and that switches and stock pens shall be ready for use by the 15th day of October, 1909."

The only serious ground of complaint urged by counsel for the railway company is that the foregoing findings, decision, and order are unreasonable and unjust, and are not supported by the evidence. Section 22, art. 9, of the Constitution, provides, in part, that:

"The commission shall, whenever an appeal is taken therefrom, file with the record of the case, and as a part thereof, a

written statement of the reasons upon which the action appealed from was based, and such statement shall be read and considered by the Supreme Court, upon disposing of the appeal. The Supreme Court shall have jurisdiction, on such appeal, to consider and determine the reasonableness and justness of the action of the commission appealed from, as well as any other matter arising under such appeal: Provided, however, that the action of the commission appealed from shall be regarded as *prima facie* just, reasonable and correct."

In construing a section of another statute similar to the latter part of the foregoing provision, the Supreme Court of the United States held:

"The findings of the commission are made by law *prima facie* true. This court has ascribed to them the strength due to the judgments of a tribunal appointed by law and informed by experience. *Louisville & Nashville Railroad Co. v. Behlmer,* 175 U. S. 648 [20 Sup. Ct. 209, 44 L. Ed. 309]; *East Tenn, etc., Railroad Co. v. Interstate Commerce Commission,* 181 U. S. 1, 27 [21 Sup. Ct. 516, 45 L. Ed. 719]. And in any special case of conflicting evidence a probative force must be attributed to the findings of the commission, which, in addition to 'knowledge of conditions, of environment and of transportation relations,' has had the witnesses before it and has been able to judge of them and their manner of testifying."

Our own Supreme Court, construing the quoted part of section 22, *supra,* held:

"On appeal from an order of the Corporation Commission, the presumption obtains, by reason of section 22, art. 9. of the Constitution, that the order is reasonable, just, and correct, and he who complains on appeal of such order has upon him the burden of establishing the unreasonableness, unjustness, or incorrectness of such order, which he may do by showing that the unreasonableness of the order appears affirmatively from the facts as certified by the commission, or that it is shown by evidence in the record, upon which the commission failed to make findings of fact, or upon which the commission erroneously found the facts." (*M., K. & T. Ry. Co. v. State,* 24 Okla. 331, 103 Pac. 613.)

Other Oklahoma cases discussing the same proposition are

*A., T. & S. F. Ry. Co. v. State et al.*, 23 Okla. 210, 100 Pac. 11, 21 L. R. A. (N. S.) 908, and *A., T. & S. F. Ry. Co. v. State et al.*, 23 Okla. 510, 101 Pac. 262.

On the question of passenger facilities, Mr. Leffingwell testified on behalf of the complainants, in substance, as follows: Have lived at Cleo for past four years. In livery business. Defendant's depot 1¼ miles west of Cleo. Carry passengers and mail from Cleo to depot. During the last 12 months carried 2,755 passengers; about an equal number walked. There is a little shed about 8 by 12 feet with roof. The east side and two ends inclosed; rain coming from north or south or west, passengers or express will get wet. We often have to wait for trains. Telephone to Fairview, 13 Miles south, but do not get correct reports. Go over there and carry the mail and wait two hours; then return to town. Have waited as high as four or five hours; then return without train coming. The night train is due there at 1:28 going north, and 5:46 going south in the morning. We have no way to find out how they will be. Go there and wait. A short time ago waited until 6 o'clock, and train did not arrive. There were some passengers wanting to return to town. Train came about 8 o'cock going north. No stove and no lights at the depot. No separate waiting rooms for colored people. Population of Cleo about 600.

Mr. G. O. Baxter, on behalf of the complainants, testified, in substance, as follows: In stock business at Cleo. Have handled a big part of my stock over the Rock Island Road. Been in the business about a year. Rock Island gives us one stock train a week. We are treated very unsatisfactory over that road. Do not give us proper connections. We would like to have it so we could ship over the "Orient." I summed up my business since the first of the year—run a little better than' one car a week. I would do more business over the "Orient" than I do over the Rock Island, if we had facilities. Had little stock shipped out of Cleo prior to the time I moved there. I would ship more than one car a week over the "Orient" if we had facilities

at Cleo. The "Orient" is direct to Wichita. Rock Island has three divisions. Have been 60 hours on the Rock Island going to Wichita. Have been about 6 hours making it over the "Orient," and about 23 hours to Kansas City. Have driven cattle to Aline and shipped over "Orient." If we had facilities at Cleo, would not ship over the Rock Island. We can ship stock every day over the "Orient." I ship to Wichita and Kansas City. I do not know what profit my business would be to railroad. Since the first of the year amounted to $2,100. The country west of Cleo is right out in the sand hills. The Rock Island has adequate passenger and freight depot in the town. Both roads run north and south.

Mr. Norton Bassett testified, on behalf of the complainants, as follows, in substance: Am a merchant, and do shipping from Wichita. It takes eight days to ship goods over the Rock Island from Wichita to Cleo, and about six days from Anthony, Kan., to Cleo over the Rock Island. I can 'phone an order to Anthony and have it come down over the "Orient" and get the goods to Cleo in the afternoon. We shipped that way quite a while, but had no place to unload our goods, and oftentimes they came without our knowing anything about it, and we were compelled to quit shipping over the "Orient." We have asked the "Orient" and did everything we could to get them to build a freighthouse so we could have goods delivered in it. They paid no attention to us. I went to the shed to take the "Orient." Started at 12 o'clock, and at half past 4 the train came. I sat in the sun $3\frac{1}{2}$ hours. This happens often. People going over there and standing in the rain in order to pay the "Orient" railway their money to get hauled up to Wichita and Kansas City. The citizens of Cleo thought it would pay the "Orient" Railway to put in the stockyards and side track, and build a freight and passenger depot. It would pay those people well to do that. We have a good business. We have the best business of any town on the road. We handle more goods out of Cleo than any other town along the

line except Watonga. We have agreed time and again to give the "Orient" the trade because their advantages are better for us.

' Other business men testified to the same effect.

Mr. Ross, chief clerk to the auditor, testified on behalf of the defendant, in substance, as follows: Chief clerk to the auditor. Compiled statistics showing freight and passenger receipts at West Cleo. These figures were for the months of January to June, inclusive. There were. 18 shipments; total weight, 6,675 pounds; earnings to the "Orient," $22.58 gross receipts. This was for freight received. We do not ship freight out. I also ascertained what business was being moved into Aline and Orienta for West Cleo for three months, January, February, and March. One shipment, 92 cents; at Aline, two shipments, 58 cents. Passenger traffic originating at West Cleo: Going out during the month of January, 124 passengers, earnings, $80.43; February, 140 passengers, earnings, $72.98; March, 133 passengers, $69.32; April, 172 passengers, $108.29; May, 192 passengers, $110.41; June, 233 passengers, $135.59. Total for six months, 994 passengers, with earnings of $577.02. Passengers destined to West Cleo: January, 138 passengers, $104.78; February, 150 passengers, $121.14; March 182 passengers, $108.36; April, 136 passengers, $98.21; May, 192 passengers, $116.05; June, 240 passengers, $135.56. Total passengers moving into Cleo, 1,088, with earnings of $682.10. Total passengers in and out 2,082, earnings $1,259.12. Total tonnage received at Orienta for six months, 242 tons, revenue $1,027.41. Forwarded, 680 tons with gross earnings of $1,757.16. From my experience the maintenance of a small station like West Cleo would cost about $50 per month, keeping the station building and platform in shape, in addition to agent's salary and adequate stationery, supplies, etc. I suppose the building and platform at Aline and stockyards and the track would possibly amount to an expenditure of some $6,000. A station building, stockyards, and platform would probably cost $3,000. At 6 per cent. interest it would be $180. The fuel, and interest on the investment included, 6 per cent., would be about $50 a month in addition to agent's

salary. The two points of terminals of the "Orient" are Kansas City, Mo., and Topolanbo Bay, on the Gulf of California. We are operating from Wichita south to Altus, distance 260 miles. The "Orient" of Texas, an affiliated line now operating 173 miles southward. Will have 80 miles more in operation by the 1st of October, and are operating in New Mexico approximately 230 to 250 miles. The "Orient" is a new road. I was never employed by a new road before. I don't know whether a new road as new as the "Orient" ever made money or not. I believe the general experience is to the contrary. I don't know how much per mile it cost to build the road. They paid the construction company $22,500 a mile in bonds. I have prepared statistics, and the "Orient" railway is not paying operating expenses in either Oklahoma or Kansas. For six months ending December 31st, the operating revenues in Kansas amounted to $150,205.89, trackage of 72.68 miles. The operating expenses in Kansas were $133,271.67, 88.73 per cent. of the revenue. Oklahoma trackage, 197.9 miles; operating revenues, $233,- 101.19; expenses, $373,307.08. Loss on the entire line of $99,- 476.30. Ratio of expenses to revenue, 126.65 per cent. It is the policy of the "Orient" railway to install depots and shipping facilities where it is needed by the public and particularly at competitive points.

We are of the opinion that this and other evidence offered at the trial reasonably tends to sustain the findings of fact of the commission. It is true there is no specific finding by the commission that the "Orient" Railway is operating at a loss, but that fact was undoubtedly taken into consideration in reaching its conclusion. The commission finds that from a purely business standpoint the railroad's financial condition would be improved by the establishment of the facilities required by the order, and to our mind there is ample evidence to sustain the finding. Whilst the Corporporation Commission, and the courts, should be careful in the exercise of their power to regulate and control new railroads that are not making running expenses, in matters pertaining to the performance of their public duties, when such control involves addi-

tional expenditures for the improvement of their passenger and freight facilities, yet this important duty should not be surrendered on that account.

"To make railroad directors the sole and ultimate judges of 'the times and places when and where the corporation will receive and convey persons and articles' on the line of its road would be to give railroad corporations the power to control the markets of the country, to create a surplus, or a famine, in agricultural, mineral, and other products; to raise or reduce the wages of labor; and to promote, or retard, at pleasure, the growth, prosperity, and welfare of towns, cities, and country. A construction that leads to such results is inconsistent with the nature of the grant to the defendant corporation, contrary to its spirit, and subversive of the public objects it was intended to promote. The Legislature will not be held to be so indifferent to the trust committed to it, as to divest itself and the state tribunals of authority over the manner in which the franchises granted by it are to be exercised in the important particulars under consideration, unless its intention to do so is expressed in specific terms." (*R. R. Commissioners v. P. & O. C. R. R. Co.*, 63 Me. 269, 18 Am. Rep. 208.)

"To establish stations at proper places is the first duty of a railroad company. The state can certainly provide for the enforcement of that duty." (*Minneapolis, St. L. L. R. R. Co. v. Minnesota ex rel. R. R. Warehouse Commissioners*, 193 U. S. 53, 24 Sup. Ct. 396, 48 L. Ed. 614.)

The record in the case at bar shows that the commission gave due consideration to all the evidence offered on behalf of the complainants and the railway, and after carefully weighing the same arrived at the conclusion that the reasonable needs and conveniences of the people of the vicinity of Cleo require the railway company to furnish additional freight and passenger facilities, and that this can be done by an expenditure of about $3,000 or $3,500, to establish sufficient and suitable depots, switch-track facilities, and stock pens and shipping facilities, and that the interest on this amount would be about $200 annually; that it will cost about $1,-000 to maintain a station of the kind and character required; that the gross total expense and interest on the investment would not exceed $100 per month; that for this outlay the railway company would receive about $3,500 worth of live stock shipments per year;

that it would probably receive from $1,200 to $1,500 in broom corn shipments that is shipped from other points; that it would receive from $1,000 to $1,200 in-bound freight shipments, and several hundred dollars of local out-bound shipments, that it does not now receive.

We are fully convinced that both the passenger and freight facilities furnished the people of West Cleo and vicinity by the "Orient" are inadequate, and we are not prepared to say that the order of the commission requiring the expenditures of the foregoing sums of money for their improvements is unreasonable. We believe, with the Corporation Commission, that the expenditure of this sum will greatly increase the business of the railway at that point, and will prove to be financially advantageous to the company, notwithstanding the location of the town of Orienta about 2½ miles south of Cleo, and south of the Cimarron river. It is a well-known fact, and the evidence in this case tends to show it, that the rivers of Oklahoma, and the Southwest generally, constitute a considerable barrier to intercourse between the people living on either side. Usually the north shore is covered by sand hills for a considerable distance from the bed of the river, making traffic by foot or vehicle between the north and south shores at times impossible, and always difficult, if not impracticable.

The order of the Corporation Commission is affirmed.

All the Justices concur.