## ATCHISON, T. & S. F. RY. CO. v. STATE *et al.*

No. 878.   Opinion Filed · November 16, 1910.

1. **RAILROADS—Establishing Stations—Corporation Commission— Orders.** The Corporation Commission is without authority to arbitrarily require a railway company to establish stations and switching facilities at places not required by public convenience or ·necessity.

2. **SAME—Stations at State Line—Necessity.** That a railway crosses the state line' at a certain point may be taken into

consideration in determining whether station and other facilities are required at that point, but that fact alone is not sufficient to sustain an order of the Corporation Commission requiring the railway company to supply such facilities.

(Syllabus by the Court.)

*Appeal from the Corporation Commission.*

Action by the State and L. W. Wolfolk against the Atchison, Topeka & Santa Fe Railway Company. From an order of the Corporation Commission, the railway company appeals. Reversed.

*Cottingham & Bledsoe,* for plaintiff in error.

*Charles. West,* Atty. Gen., and *George A. Henshaw,* Asst. Atty. Gen., for the defendants in error.

KANE, J.    This proceeding was commenced by a communication with ten signatures attached addressed to the Corporation Commission, which stated, in substance, that, We, the undersigned, earnestly request that you do all in your power to place a depot on the state line between Texas and Ellis county, Oklahoma, on the A., T. & S. F. R. R. This is a question that is of vital interest to the farmers of Western Oklahoma, and they are waiting and watching with interest to see what you will do with it.    Thereafter, certain citizens of Goodwin, Oklahoma, requested, and were given permission to intervene in said hearing and submit evidence asking the commission to locate the depot at or near the postoffice of Goodwin, instead of on the state line. Thereafter the railway company filed its objections to the prayer of the complaint, wherein, among other allegations, it alleged, in substance, that the railway company has located on its line of railway in the state of Texas a depot and yard, sidetracks and station facilities at the town of Higgins, in the state of Texas, only one and three-tenths miles west from the state line between the states of Texas and Oklahoma, and within one and three-tenths miles of the proposed location as asked by the complainants herein.    That said town of Higgins, with facilities as above set out, is a city of approximately two thousand people, in which

city all lines of trade and traffic are represented, and where all facilities are established and maintained by the railway company for handling all classes of traffic which may be offered for shipment over said line of railway. That the public roads between the town of Higgins and said state line are in splendid condition; well maintained and are ample for the use of the citizens of said community. That said station facilities, so conceded as above, with depots and yards and sidetracks, were installed by said railway company at an expense of several thousands of dollars and are adequate and ample and complete for all present demands or future needs, and have been and are and will be in the future maintained and kept by said railway company in proper condition to serve the public. On which account there is no necessity for an order requiring said railway company to build or construct additional depot facilities or yards, or sidetracks in such close proximity to the town of Higgins, and on which account an order requiring said railway company to install station facilities on the state line in such close proximity to the station of Higgins would be unreasonable, unjust and beyond the power and jurisdiction of this commission. That, in addition to said station at Higgins, said railway company has a station approximately seven miles east from said town of Higgins already established and with ample depot facilities, sidetracks and yards, and all facilities for serving the public, so that in said community the passengers on said railway have ample depot and railway facilities within four miles in either direction, which the railway company submits is ample and sufficient; that to order additional facilities to those already established and tendered to the public on the part of the commission would be unreasonable and unjust and beyond the power of the commission. Thereafter the railway company filed objections to the intervening petition of the citizens of Goodwin, wherein, among other things, it was alleged that said railway company is a corporation organized and existing under and by virtue of the laws of the state of Kansas, and doing business in the state of Oklahoma, and extending through Ellis coun-

ty, in said state. That said railway company is building and causing to be built a line of railway from Belen, New Mexico, to and through Ellis county, Oklahoma, to connect with other lines of its railway to Kansas City, thereby making a low grade main line from Chicago to the Pacific Coast, which said railway passes through Ellis county and near Goodwin postoffice in said county. That said line of railway consists largely of new construction and relocating and rebuilding of a line of railway already in existence, the maximum grade on which said reconstructed line will not exceed six-tenths of one per cent. That, in rebuilding such line, said railway company has expended many millions of dollars and has in many instances been compelled to abandon the old line as established, and in building has expended in many places twice the cost of the abandoned line per mile. That, between the stations at Higgins, Texas, and Shattuck, Oklahoma, a distance of 14.2 miles, the costs of rebuilding the line, exclusive of the value of the old line abandoned, exceeds the sum of $275,000. That the postoffice of Goodwin is located on the old line so abandoned by said railway company, 4.7 miles northeast of Higgins, Texas, and 9.5 miles south and west from Shattuck, Oklahoma. That the relocated and reconstructed line, where it passes Goodwin postoffice, is approximately 1,500 feet from the old and abandoned line, the old line being on a one per cent grade from Shattuck to Goodwin, the new line being on six-tenths of one per cent as a maximum. Then follow allegations setting up the impracticability of establishing facilities at or near Goodwin postoffice, after which it is further alleged, in substance, that the first station on the west of Goodwin postoffice is Higgins, Texas, the first station on the east is Shattuck, Oklahoma, the distance between those stations being 14.2 miles. That the railway company has never established a station at Goodwin postoffice or encouraged the location of a townsite at said point, for the reason that for many years it has been the intention to relocate and rebuild said line of railway and relocate and build a station at some consistent place as nearly

as possible midway between the stations of Shattuck on the east and Higgins on the west. That, in seeking a location for such depot and station between said points on said relocated line, the only place where a station could be suitably located was three miles east of the present Goodwin postoffice, at which point grading has been done for sidetracks and depot grounds at a cost and expense of about six thousand dollars, which site was the best place that could be selected, from an engineering and operating standpoint, where a station could be safely installed and side-tracks built and operated, and, even then, where said station is so constructed, it is on grade of four-tenths of one per cent, which is the limit of grade on which a station and sidetracks may be safely constructed and operated. Said proposed station being six and a half miles west of Shattuck and seven and seven-tenths miles from Higgins, which is practically equidistant between stations already existing on said line. That said reconstructed line was built at such great expense with a view of handling large amounts of interstate traffic and heavy freight business, in addition to serving all the localities through which it passes, and will be constantly used for heavily loaded cars and large locomotives and motive power, which cannot be stopped and started on maximum grades, and to locate and build a depot and station with sidetracks at or near Goodwin postoffice would render it impossible to operate the railroad in a practical way, either for through or local business, and would greatly endanger and hinder the interstate traffic of said railway and place such a burden on said interstate traffic as greatly to interfere with the proper handling and transaction of such traffic and practically destroy a portion of the business for which said railway company is organized and is proposing to transact. It is hoped the commission will take into consideration the character of business, both local and interstate, which it is destined to transact on said railway, and not make an order locating a depot and sidetracks at a point which would so largely depreciate the value and usefulness of the property for the purposes for which it was intended. That

said proposed order of the commission involves the right of the railway company to carry on interstate commerce in the state of Oklahoma without becoming subject to such unreasonable orders and directions of the Corporation Commission, which so directly burden interstate commerce as to amount to a regulation thereof, which burdens and regulations of said railway company's business amount to a great deal more than two thousand dollars to said railway company.

On the 22nd day of October, 1908, upon the issues thus joined, said proceeding came on for hearing before the commission, and the commission, after hearing the evidence, entered order number 154, which order, omitting the caption, is, in words and figures, as follows:

"L. W. Wolfolk and other citizens of Grand, Oklahoma, filed a complaint, praying that the defendant be required to build and maintain a depot and depot facilities at a suitable point near the state line on what is known as Panhandle branch of the defendant's railroad, between Oklahoma and Texas. Also the citizens in the vicinity of Goodwin, Oklahoma, about five miles northeast of the state line, had formerly filed a complaint, asking that a depot be established at Goodwin. That, in the consideration of this complaint, the commission heard evidence as to the most practical and available place for depot at Goodwin or at a point between Goodwin and the state line, and finally ordered a depot to be established at a point near the state line. The citizens of Goodwin made an informal motion for a rehearing, and the commission suspended the order by informally notifying defendant that it need not comply with the order until further investigation. The rehearing or reconsideration of the two cases, establishing a depot at Goodwin and at the state line, was heard by the commission on the complaint first above mentioned, it being apparent that if a depot was established at Goodwin, there would be no necessity for a depot at the state line, and *vice versa.* Therefore, all parties interested at either place were heard. It appears from the evidence that the defendant, during the last year, has reconstructed and relocated its line of road that passes Goodwin, and that the distance between the state line and Shattuck, Oklahoma, is fourteen miles; that the postoffice at Goodwin is located on the old line abandoned by said railway company,

four miles northeast of the state line, and 9.5 miles southwest from Shattuck, Oklahoma. That the reconstructed line passes Goodwin about 1,500 feet from the abandoned line; that, at or near Goodwin, the new line, as now built, runs through a cut fifteen feet deep, and fifteen hundred feet long, and at each end of the cut is a draw or fill connecting with another cut; that to establish a depot and switching facilities at this place would be of considerable expense to the defendant, and inasmuch as a depot has been established two and one-half or three miles north of Goodwin, the commission is still of the opinion that a depot at Goodwin would not serve the people and be as great a convenience to the general public as it would have been had there been no depot established between Goodwin and Shattuck. There was considerable evidence with reference to the public roads leading to Goodwin, and the town north of Goodwin, and to a point near the state line. However, so far as the public road question is concerned, there seems to be no great difference between any of these points, and good roads could be established without unreasonable expense to either of them. The evidence clearly shows that a majority of the wheat from that entire section of the country is hauled to Higgins, Texas. The commission finds that a depot established at a point near the state line would be about the average distance that the defendant places depots within the state of Oklahoma, same being about six or seven miles from the depot established between Goodwin and Shattuck; that the same is necessary and a great convenience for the citizens in the vicinity of the location where a depot is desired near the state line. The commission is of the opinion that the defendant should be required to establish depot and switching facilities at a suitable point near the state line, to be hereafter designated by the commission. It is, therefore, ordered that the defendant, the Atchison, Topeka & Santa Fe Railway Company, build a depot and establish necessary switching facilities at a point near the state line between Texas and Oklahoma, in Ellis county, said point to be hereafter designated by the commission. That this order shall be complied with by the 1st day of March, 1909."

To reverse the foregoing order this proceeding in error was commenced.

The order of the Corporation Commission must be reversed, for the reason that there was not sufficient evidence adduced at

the trial upon which to base it. The complaint requesting that a depot be placed at the state line does not set up any facts showing the necessity for such a facility, and on the trial of the case none of the parties who signed the complaint appeared, and there was no attempt to show by evidence that the establishment of a state line depot was a necessary and reasonable exaction to require of the railway company on behalf of its patrons. All of the witnesses for the complainants who appeared, viz., Messrs. Clark, Edmondson, Bowles, Vermillion, Oates and Cupp, seem to have been adherents of Goodwin, and all testified to the effect that conditions were such that the railway company should furnish station and shipping facilities at or near that place. And the examination of these witnesses by the assistant attorney general was directed toward establishing the necessity and reasonableness of an order to that effect. It is true the chairman of the commission also examined the same witnesses for the purpose, presumably, in view of the order entered, of showing the necessity and reasonableness of a state line depot. The following questions and answers indicate the nature of the evidence thus elicited. Mr. Clark was on the stand, being examined by the chairman:

"Q. Do you know the price they paid for wheat at Holstein this year? A. No, sir. Q. Do you know what they paid at Higgins? A. Yes, sir. Q. Don't you know that they paid a higher price at Higgins this year than they did at Holstein or Shattuck, either? A. Yes, sir. Q. Do you know the reason of that? A. The rate given, I suppose. Q. Do you know the rate on wheat from Holstein to Galveston? A. No, sir. Q. Do you know the rate from Higgins to Galveston. A. No, sir. Q. Do you know the difference in prices of wheat from Holstein and Higgins? A. I don't. Q. Do you know the price they would charge you to haul wheat from Higgins and Holstein? A. No, sir. Q. Do you know how far it is from Holstein to Higgins? A. By rail? Q. Yes, sir. A. No, sir. Q. How far is it by wagon? A. About ten miles, I would say. Q. This is a proposition we are getting at for the interest of farmers, irrespective of town sites. Haven't you understood—in that country hasn't it been generally talked—that you get from eight to ten

cents more for wheat in Higgins than you do at Shattuck or Holstein? A. There has been a difference in the price, but what it has been I don't know. Q. The fact of it is, from Holstein to Galveston the freight is twenty-one and one-half cents, and from Higgins to Galveston it is twenty cents, making a difference of a cent and a half; yet you get from eight to ten cents more for wheat billed from Higgins or any Texas point than you do from any placed—billed—that is, billed from Holstein or any Oklahoma point. Now, then, isn't it a fact that the people of Texas are hauling their broom corn to Shattuck and selling it, and Holstein? A. I don't know. Q. Haven't you seen anything of that kind being done? A. The only produce that goes past my way goes to Higgins. I don't see anything that goes to Shattuck or Holstein. Q. Have you seen any broom corn going to Higgins? A. Yes, sir. Q. This year? A. Yes, sir. Q. Here is the proposition: If it is a fact that you get ten cents a hundred more for 'your wheat in Higgins than you do in Holstein, or at Goodwin, if there were shipping facilities there, then the proposition is, if a state line depot was put there on the state line and switching facilities, for the benefit of the working class of people, irrespective of town site speculations, wouldn't you favor a state line depot there? A. If the buyers would pay in proportion to the rate, I wouldn't haul my grain there for that amount. Q. What do you mean by the buyers? A. You stated the difference in the rate would be one and one-half cents a hundred, and still the buyers are making a ten-cent difference. I can haul grain for ten cents a bushel, but I wouldn't haul it for a cent a bushel."

The following is taken from the examination of Bowles by the chairman:

"Do you know what the rate is from Higgins to Galveston? A. No, sir. Q. I will tell you, for your information, the rate from Holstein to Galveston is twenty-one and one-half cents; the rate from Higgins to Galveston is twenty cents. If you could get as much in Oklahoma for your wheat as you could get in Higgins, Texas, in proportion to the freight rates, it would only be a cent and a half a hundred less, but on account of billing from Texas you get from three to five cents a bushel more? A. Yes, sir. Q. Now, then, for the benefit of the farmers in that country, if a state line depot could be placed on the line between Texas and

Ellis county and a switch put in on the Texas side so you could bill your wheat out of Texas and do your trading in Oklahoma, wouldn't it be a better proposition for the people to have a state line depot than it would to have one at Holstein or old Goodwin?' A. It would, if the farmers got enough out of their grain to pay them to haul it there. Q. You get enough more out of your grain to haul it to Higgins, Texas, don't you? A. We have been, but if the rates are that close, I don't see any necessity for it."

Mr. Oates, who was probably the most favorable witness for state line depot, was examined as follows:

"State whether or not, in your judgment, a considerable number of people would be accommodated by having a railroad station on the Santa Fe Railroad at or near the state line between Oklahoma and Texas. A. Yes, sir; I think so. Q. Give your reasons for thinking that these results would accrue. A. I mean if we had the same rates as Texas had, it would give Oklahoma a chance to market their own stuff."

On cross-examination, he testified:

"Your idea for locating a station at the state line nearly a mile and a half from Higgins would be simply to control what is known as interstate rates? A. Yes, sir; and I live in Oklahoma, and I would like to build up our own state. It might have a tendency to give us a small town—taxable property, and such like."

There was no evidence introduced or offered tending to show that there is any town, village, settlement or gathering of people of any kind on the line of railway at or near the state line; nor how many people reside in the adjacent country within such a distance from the point where the railway crosses the state line that they would do their railroad business there if facilities were furnished. On the other hand, there was evidence, which was uncontradicted, to the effect that: Higgins is the nearest station on the west and Shattuck is the nearest on the east to the present station of Goodwin, and that Shattuck and Higgins each has a population of about fifteen hundred, and are located about fifteen miles apart. That the present station of Goodwin is a little over six miles from Shattuck and a little over seven miles

from Higgins, and three miles east of the old station of Goodwin. The new station of Goodwin is more accessible than many stations and will be aćcessible from every direction with very little .work. At the present time it may be reached from all directions, delivering a full load; that the grade at (Old) Goodwin was six-tenths, including the compensation for curvature, which was the maximum on the road. That the actual grade at (Old) Goodwin is between four and five-tenths, which, with the curvature, made it as difficult to pull as six-tenths on a straight track. That it required 3,000. feet of switch for passing track, and that it was good railroading to have the passing track at stations. That the present station of Goodwin, sometimes referred to in the evidence as "Holstein" or "New Goodwin," is six miles from the Texas state line. With reference to a location for a depot at the state line, the following questions were propounded by Mr. Henshaw, and the following answers given by Mr. Turner:

"Q. There are plenty of good locations in that territory near the state line that there could be no physical objections to a depot, isn't there? A. A station could be put there by spending the money to grade down and fill the holes. Q. There are locations there that stations could be built without much work? A. A good deal of work. It would take a good deal of work. Q. Are there any locations near the state line where a depot could be located? A. No, sir; no level. Q. Within a reasonable distance from the state line? A. There is no level there, according to my memory, exceeding six or seven hundred feet."

Mr. C. A. Morse, chief engineer for the railway company, testified to the same condition with reference to grades, and that the entire line of the Santa Fe through the northwest corner of the state has been reconstructed, practically rebuilt, from Wellington, Kansas, to Texico, New Mexico, and that maximum grade of the line, including curvatures, was six-tenths of one per cent, and that it was built for the purpose of a heavy through freight line from California to the East. That the company was unable to find a grade at the old station of Goodwin that would permit

the building of a station there. That as the stations were now located, the present station of Goodwin is about equally distant between Shattuck and Higgins, and that there were stations at these places with all necessary facilities; that just north of the state line, beginning about seven hundred feet, there is one thousand or fifteen hundred feet of seven-tenths grade, a little above the maximum, what we term in railroad parlance "velocity grade." And then, north and east of this, there is a strip of two or three thousand feet that is nearly level. On the subject of building stations on grades of this character, Mr. Morse testified with reference to the construction of a station at Goodwin, where the grade is much less, that you cannot stop a full train load and start it on a place like that. It is not practicable to do so. That, from his experience of twenty-eight years as a railroad engineer, it was impracticable to construct a station with the amount of grade that existed at Old Goodwin, and should not be done, and that is the reason why it was changed.

For a disposition of the questions involved in this case it is not necessary to examine the statutes which empower the Corporation Commission to require the railways of the state to provide and maintain adequate depot buildings and shipping facilities for the reasonable needs of the people tributary to their lines, for, conceding that such power exists, it does not follow that it may be arbitrarily exercised when there is no public necessity therefor. *N. P. Ry. Co. v. Washington Territory*, 142 U. S. 492.

In 1905 the general assembly of the state of Arkansas passed an act requiring the building and construction of a depot and the maintenance thereof at Snow Crossing, in Columbia county, Arkansas, by the L. & A. Ry. Co., and requiring passenger and local freight trains to stop there and receive passengers and freight, and prescribing penalties and damages for violations of the act. The company failed to construct a station or depot as required by the act in question, and the grand jury returned an indictment against it. The railway company filed a general plea

of not guilty and a special plea containing the following statements:

"It states that the country around Snow Crossing is principally wild and uncultivated and sparsely inhabited; that the cleared land is devoted principally to the raising of cotton, which cotton is hauled to the neighboring towns of Magnolia and Lewisville, where the farmers purchase their supplies; that the station of Experiment is situate about two and one-half miles north of Snow Crossing, and that passengers and freight are received and discharged at such station; that the station of Taylor is situate four and one-half miles south of Snow Crossing on the line of said railway company; that there is a depot building and telegraph operator with passenger and freight agent employed at said station; that the two stations of Experiment and Taylor furnish to the inhabitants contiguous to Snow Crossing ample facilities to board the trains as passengers or to ship their freight, and that to force the railroad to maintain a regular station at Snow Crossing would require three stations maintained by said railway company within seven miles in a sparsely settled region; that to erect a station at Snow Crossing would cost approximately $1,000; that to maintain same would cost $75 to $100 per month, and that the receipts from freight and passengers at such station would meet only a small proportion of the cost of maintenance, and that such station would have to be operated at a monthly loss to the railway company; * * * that Snow Crossing is located at the foot of a very heavy grade on the line of said Louisiana & Arkansas Railway Company—the heaviest grade at any point on said line; that because of the topography of the country it would be impracticable, with very great expense, to provide side tracks and passing tracks at said point, as required by said Act No. 105; and that to attempt to comply with said act by stopping all freight and passenger trains, would, by reason of said hill and steep grade, add greatly to the danger of accidents to passengers and employees upon said railway."

The case was tried before the court without a jury, and the state introduced proof establishing the fact that the appellant had not complied with the requirements of the statute. The railway company offered to introduce evidence to sustain the allegations of its special plea, but the court refused to hear the evidence. The

court then made a finding that the railway company was guilty as charged in the indictment, and assessed a fine of $25 against it, and the defendant appealed. Mr. Justice McCulloch, who delivered the opinion of the Supreme Court (*L. & A. Ry Co. v. State,* 106 S. W. [Ark.] 960), after discussing the question whether a special act of the Legislature requiring a railway company to construct and maintain a station at a given point on its line is subject to review by the courts, said:

"This brings us to a consideration of the questions whether or not the appellant in this case offered to bring to the attention of the court facts sufficient to show that there is no public necessity for a station at Snow Crossing, and that the requirements of the Legislature in that respect are so arbitrary and unreasonable as to demand a judicial review so as to relieve the railroad company from compliance therewith. The rejected evidence tended in substance to show that there was no public necessity at all for the maintenance of a station at Snow Crossing; that the land around that place, which is not a point of intersection of two railroads, but is only the crossing of a country road over the railroad, is principally wild, uncultivated and sparsely settled; that there is such a natural heavy grade at that point on the road as would render it not only very expensive to build sidetracks, but would add greatly to the danger of accidents in stopping trains; that there is now a flag station on appellant's line, two and one-half miles north of Snow Crossing, and also a regular station four and one-half miles south of Snow Crossing, where there is a depot building, and where a telegraph operator and passenger and freight agent is kept; that these two stations provide suitable, convenient and ample transportation facilities to the people near Snow Crossing; and that the cost of erecting and maintaining a station at that place would be greatly in excess and out of proportion to the revenues which could possibly accrue from the business at that place, and that the station would have to be operated at a monthly loss to the company. Now, this evidence tended to show that there is no public necessity for a station at the place named, and the court should have heard and considered it for the purpose of determining whether or not the statute was a valid exercise of power by the Legislature. As we have already stated, the authority of the Legislature to regu-

late railroad companies, and to compel them to establish stations and build depots whenever the public necessity and convenience requires, is not disputed; and, as the Legislature has. that right and power, the presumption is that it exercised it in a proper case, and that the public convenience required the station at that place. But that presumption was not conclusive. The burden to show that there was no necessity for a station at that place was on the company, and it had the right to be heard on the . question whether the act of the Legislataure was an arbitrary and unreasonable exercise of the legislative power, which would result in putting the company to useless expense. As the Legislature had no power to confiscate or deprive the company of its property, where no public necessity requires it, it is plain both from reason and from authority that it had no right to arbitrarily require a railway company to establish stations at places not required by public convenience or necessity. So if, after considering all the facts and circumstances, giving due consideration to the determination of the Legislature, and resolving every doubt in its favor, the court should be convinced that there was no public necessity for a station there, and that the result of enforcing the act would be to put the defendant to large expense without any corresponding benefit either to it or the public, then the Legislature had no right to make such requirement, and the court should so declare as a matter of law."

Whilst it is probably true that the fact that a railway crosses a state line at a certain point may be taken into consideration in determining whether station and other facilities are required at that point, we do not believe that that fact alone is sufficient to justify the Corporation Commission in requiring the erection of a state line depot and other expensive facilities. *State ex rel. R. R. & Warehouse Com. v. M. & St. L. R. Co.* (Minn.) 79 N. W. 510. Particularly is this true when- the uncontradicted evidence shows that there are natural impediments on the line of railway at the state line that render that place impracticable or inconvenient for the railway company to provide such facilities, and which would probably hamper the handling of its interstate business. It is true that our statutes providing for the regulation of the railways of the state in their relations to the public impose

duties to be performed in Oklahoma, but it would be an unreasonable exercise of the power granted to require railroads at a large expense to erect facilities where their roadway crosses the state line for no other reason that that it is the state line. In *Railroad Commission of Texas v. C., R. I & G. Ry. Co.* (Texas) 117 S. W. 794, Mr. Justice Williams, speaking for the Supreme Court of Texas, in construing the words "place of starting" in a statute that required every railway corporation to start and run their cars for the transportation of passengess and property at regular times, to be fixed by public notice, and furnish sufficient accommodation for the transportation of all such passengers and property as shall within a reasonable time previous thereto be offered for transportation at the place of starting, etc., said:

"We do not mean to be understood as holding that the mere fact that the rails stopped at the state line makes the point of contact one at which a station must be maintained. The words used in article 4494 must be understood to mean what they meant when first adopted into our legislation. They were so employed at a time when the chartering of railroad companies by private acts of the Legislature was just beginning in this state and in other parts of the country. The charter usually authorized the construction of the roads between points named as their termini, and these were referred to as places of starting. The thought was not in the legislative mind that a 'place of starting' would be in an unbroken forest, a wild and unsettled prairie, a river swamp, or the middle of a stream forming a boundary line of the state. The roads were to run from town to town and these were their termini, their 'places of starting.' The state line is, in law and in fact, one terminus of the line of a railroad intersecting it constructed by a Texas corporation, because its powers cease at that line; but if there is no 'place' there such as is meant by the language of article 4494, the mere ending of the track does not bring into existence the duty defined in these statutes. To hold that it does would wrench the law from its obvious meaning and purpose and carry it to absurd extremes. To avoid this and at the same time accomplish the good aimed at will not be found very difficult in practice if the true intent of the statute is kept in mind."

It is true that in that case the railway was required to es-

tablish a state line station, but the decision is based upon the ground that the facts established at the trial showed that the state line was a "place of starting" within the meaning of the statute. In *State ex rel. R. R. & Warehouse Com. v. M. & St. L. R. Co.*, *supra*, the Railroad and Warehouse Commissioners of Minnesota, upon the petition of numerous citizens, and after a hearing at which the railway company appeared and opposed the granting of the petition, made an order requiring the Minneapolis and St. Louis Railway Company to build and maintain at Emmons, a small, unincorporated village on the line of its road, a station house for the convenience of the public. The facts found by the commission were, in substance, as follows: Emmons is on the line of the M. & St. L. R. Co., and has a population of about 100. It has 3 stocks of general merchandise, 2 hardware stores, 3 blacksmith shops, 2 restaurants, 1 furniture store, 1 drug store, 1 lumber and coal yard, 1 grain elevator, 1 feed mill, 1 creamery, 1 butcher shop, 1 livery stable, and 14 or more dwelling houses; and tributary thereto is a rich and populous agricultural country, which extends to a distance of 15 or 16 miles in a westerly direction, and 5 or 6 miles in other directions. That it is 5 and 7/10 miles from Emmons to the first railroad station on the line of said railroad north of it, and there is no station on the line of said railroad south of Emmons within the state of Minnesota. That there is a station called Norman, in the state of Iowa, 7/10 of a mile by rail, and 1 mile by wagon road, from Emmons; but said Norman, being within the state of Iowa, is not subject to the jusisdiction or control of this commission. The second paragraph of the syllabus of that case reads as follows:

"The facts considered, and held not to justify an order of the Railroad and Warehouse Commissioners, requiring the defendant to build and maintain a passenger station at an unincorporated village of 100 inhabitants, situated in a strictly rural and agricultural part of the state, and within seven-tenths of a mile of an existing passenger and freight station. The fact that the existing station is situated across the state line in another state,

is, in and of itself, no reason for requiring the defendant to build and maintain another station."

Mr. Justice Mitchell, who delivered the opinion for the court, after construing a statute of the state of Minnesota, which provided, in substance, that all railroad companies shall provide, at all villages and boroughs on their respective roads, depots with suitable waiting rooms for the protection and accommodation of all passengers patronizing such roads and a freight room for the storage and protection of freight, and holding that the word "village," as therein used must be construed as referring only to incorporated villages, said:

"But there is no doubt of the power of the commissioners under the general railroad and warehouse commission act, to require a railroad company to provide a suitable depot and passenger waiting room at any place, incorporated or unincorporated, where public necessities or convenience reasonably requires it to be done. But this power is neither absolute nor arbitrary. The facts must be such, having regard to the interests, not only of the particular locality, but also of the public at large and of the railroad company itself, as to justify the commissioners, in the exercise of a reasonable discretion and judgment, in ordering the railway company to provide a depot and passenger station at the place in question."

We think this quotation from the opinion states the law applicable to the case at bar correctly. This same case, after another trial, was again before the Supreme Court of Minnesota, *State ex rel. Railroad & Warehouse Commission v. Minneapolis & St. L. R. Co.*, 91 N. W. 465, where an order commanding the railroad company to build and maintain a station house or depot at Emmons was sustained by a divided court. In the last opinion it was said:

"We do not question the correctness of the conclusion reached when considering the former appeal. But two members of the court, Mr. Chief Justice Stuart and Associate Justice Brown, are of the opinion that from the evidence it appears that there has since been a substantial growth in the village,—a growth which makes an altogether different showing,—and that the company did

not overcome the *prima facie* case arising by virtue of the statute, and therefore that the judgment appealed should be affirmed."

It will be seen that the last opinion in no way disturbs the rule formerly laid down. The Attorney General in his brief recognizes the soundness of the rule laid down in those cases, and its applicability to the facts in the instant case, and does not urge any advantages that may. flow to the public on account of any difference a state line depot may make in interstate rates, as a proper ground upon which to ,require the railway to provide facilities at the state line. He says:

"Counsel for appellant addressed the principal parts of their argument in this case to the question that the object of this order was an indirect interference of interstate commerce. This assumption is so erroneous that we do not deem it necessary to reply to this line of argument. It cannot be insisted for a moment that the state of Oklahoma has any jurisdiction or could make any order that would directly or indirectly cast a burden on interstate commerce; that it could not make an order even in aid of interstate commerce where congress, either by direct act or through Interstate Commerce Commission, has prescribed regulation in reference thereto. The question in this case is whether or not there is a reasonable necessity for a depot on the defendant's line within the state of Oklahoma for the accommodation of the citizens of Oklahoma, that they may avail themselves of rates prescribed by the Oklahoma commission without driving an unreasonable distance to ship their commodities."

We believe that the evidence clearly shows that no reasonable necessity exists for a state line depot; in the face of this evidence, it was unreasonable to require the railway to place a depot there. We are not unmindful that on appeal from orders of the Corporation Commission, the presumption obtains that the order appealed from is reasonable, just and correct, and that he who complains on appeal from such order has upon him the burden of establishing the unreasonableness, unjustness or incorrectness thereof. *K. C., M. & O. Ry. Co. v. State*, 25 Okla. 715, 107 Pac. 912. But in the case at bar it appears from the facts as certified by the commission, and the uncontradicted evidence upon which

findings are not made, that the order of the commission is erroneous. The order of the commission is, accordingly, reversed.

All the Justices concur.